UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

LORETTA CARTER-MILLER,

     Plaintiffs,

    v.

STATE OF WASHINGTON, et al.,

     Defendants.

CASE NO. C07-1825RAJ

ORDER

## I.  INTRODUCTION

This matter comes before the court on Defendants' motion for summary judgment (Dkt. # 109).  Defendants requested oral argument; Plaintiff Loretta Carter-Miller did not. The court finds oral argument unnecessary.  For the reasons stated below, the court GRANTS the motion for summary judgment in part, and reserves ruling on the remainder of the claims pending additional briefing from the parties.  The court VACATES the trial date and all pending deadlines, and issues a new pretrial schedule.

## II.  BACKGROUND

Ms. Carter-Miller completed a one-academic-year employment contract as an instructor at Defendant Bellevue Community College ("BCC") in May 2007, and a separate short-term contract in summer 2007.  Ms. Carter-Miller taught in BCC's Associates Degree Nursing Program ("ADNP"); she did not teach in other programs or academic departments.  Ms. Carter-Miller left BCC at the expiration of her second contract.  She did not apply for another job at BCC or attempt to renew her contract.

ORDER – 1

During Ms. Carter-Miller's tenure at BCC, Sybil Weber was the chair of the ADNP, and Lisa Tedeschi and Nancy Karnes were instructors and "coordinators" in the program. Ms. Karnes served as Ms. Carter-Miller's faculty mentor. Carter-Miller Decl. ¶ 17. Dr. Maurice McKinnon was the director of BCC's Health Sciences, Education, and Wellness Institute, the larger academic unit to which ADNP belonged. She was Ms. Carter-Miller's immediate supervisor. McKinnon Decl. ¶ 10. At all relevant times, Dr. Ron Leatherbarrow was the Executive Dean of Instruction at BCC. Dean Leatherbarrow, Ms. Weber, and Ms. Tedeschi are Defendants in this matter, as is Jean Floten, the president of BCC.

Ms. Carter-Miller is African-American. During her employment at BCC, she was the sole full-time African-American ADNP instructor, although another African-American woman worked as part-time instructor beginning in January 2007. Carter-Miller Decl. ¶ 33. There is no evidence in the record of the part-time instructor's experiences working at BCC.

Ms. Carter-Miller was dissatisfied with her employment at BCC. Some of her dissatisfaction arose from her working conditions and her relationship with her co-workers. For example, Ms. Carter-Miller was unhappy with the mentoring she received from Ms. Karnes, Ms. Tedeschi, and Ms. Weber. Carter-Miller Decl. ¶ 35 ("[N]o one actively mentored me."); Felton Decl. ¶5 (stating that Ms. Karnes and Ms. Tedeschi did not support Ms. Carter-Miller or help her succeed). She asserts that at least two other ADNP faculty members, Ann Yokota and Fran Ippolito, received better mentoring than she did. Carter-Miller Decl. ¶¶ 30-33; McKinnon Decl. ¶ 53. Her interactions with Ms. Tedeschi were unpleasant. According to Ms. Carter-Miller, Ms. Tedeschi announced as early as an October 30, 2006 faculty meeting that "she did not like" Ms. Carter-Miller. Carter-Miller Decl. ¶¶ 15. Ms. Tedeschi allegedly spoke to her in a "chilly, snotty, and unwelcoming" tone when Ms. Carter-Miller inquired about being reassigned to a preferred clinical site. Carter-Miller Decl. ¶ 25. When Ms. Carter-Miller taught classes

ORDER – 2

jointly with Ms. Tedeschi, Ms. Tedeschi "disregarded" her and gave her orders in the presence of students. Carter-Miller Decl. ¶ 40. Ms. Carter-Miller found this "humiliat[ing]" and believes that it eroded her credibility as an instructor. *Id.* On November 9, 2006, Ms. Weber informed Ms. Carter-Miller in the presence of a student aide that she was supposed to be attending and assisting with a lab class that Ms. Tedeschi was teaching. Carter-Miller Decl. ¶ 16. Similarly, Ms. Karnes was "very snotty" when she told Ms. Carter-Miller she was supposed to be in lab on one occasion. Carter-Miller Decl. ¶ 34.

Some of Ms. Carter-Miller's dissatisfaction arose from her interaction with her students and complaints those students made about her. The court need not describe these teacher-student conflicts in detail, except to say that they related to Ms. Carter-Miller's instructional style, her alleged lack of preparation for some classes, and her allegedly rude and dismissive comments to students. The parties devote too much of their resources to a debate over whether the students or Ms. Carter-Miller are more responsible for these conflicts. The court need not resolve that debate. It suffices for purposes of this order to observe that it is undisputed that the students communicated their complaints to other instructors and administrators in the ADNP. *See* Declarations of S. Thompson, Y. Gelfman, L. Nicoulin, H. Yim, and T. Schmaltz.

Several incidents in particular put a pall on Ms. Carter-Miller's employment at BCC. In November 2006, Ms. Tedeschi notified Ms. Carter-Miller's students by e-mail that a day's classes would be canceled because of snow. Carter-Miller Decl. ¶ 38. Ms. Carter-Miller was unaware of the decision, and only discovered Ms. Tedeschi's e-mail after she arrived at BCC that day. Carter-Miller Decl. ¶ 39; Carter-Miller Depo. at 68-69.[1] Several students also arrived at class having not received the cancellation e-mail. Carter-Miller Depo. (Parisien Reply Decl., Ex. 1) at 69:7-9. After she arrived at campus,

---

[1] Ms. Carter-Miller's declaration is muddled regarding her receipt of the e-mail. She states that Ms. Tedeschi did not send the e-mail to her, yet she admits that she was able to read it from her BCC computer the morning it was sent. Carter-Miller Decl. ¶ 39; Carter-Miller Opp'n at 5.

ORDER – 3

but before she checked her work e-mail, she complained to Dr. McKinnon that she believed Ms. Tedeschi and Ms. Karnes were discriminating against her because of her race.  Carter-Miller Decl. ¶ 38.

In December 2006, Ms. Tedeschi asked Ms. Carter-Miller to attend a meeting to discuss concerns about her performance.  Ms. Carter-Miller brought Sharon Felton, an ADNP counselor, to the meeting, where Ms. Tedeschi gave Ms. Carter-Miller a three-page document purporting to contain concerns from students and faculty.  Carter-Miller Decl. ¶ 42.  Ms. Felton found Ms. Tedeschi to be "abrupt and hostile in her tone and body language" during this meeting.  Felton Decl. ¶ 11.  Ms. Carter-Miller disagreed with the content of the document and found it inaccurate.  Carter-Miller Decl. ¶ 42.  After the meeting, she met with Dr. James Bennett, BCC's vice president for equity and pluralism, and complained that the document was further evidence of discrimination.  Carter-Miller Decl. ¶ 43.  In March 2007, Dr. McKinnon scheduled a meeting with Ms. Carter-Miller, Ms. Karnes, and Ms. Tedeschi.  McKinnon Decl. ¶ 19.  Ms. Karnes attended, but Ms. Tedeschi did not.  *Id.*; Carter-Miller Decl. ¶ 45.  At that meeting, Ms. Carter-Miller distributed a document she had prepared describing her concerns.  Carter-Miller Depo. at 110; Parisien Decl., Ex. 10.  Although the document references a "hostile and repressive" environment for students and new faculty, and notes the "underhanded tactics" of her co-workers, it does not mention race or discrimination.  Parisien Decl., Ex. 10.

In February 2007, Ms. Karnes came to Overlake Hospital, Ms. Carter-Miller's clinical instruction site for that quarter, and again undermined her in front of her students by taking over her class for the day.  Carter-Miller Decl. ¶¶ 53-55.  It is undisputed that Ms. Karnes' appearance was prompted by an e-mail from an Overlake employee to Ms. Weber and Ms. Tedeschi complaining about Ms. Carter-Miller's supervision of students at Overlake, along with student complaints to Dr. McKinnon regarding the use of equipment at Overlake.  Selg Decl. ¶ 11, Ex. 3; McKinnon Decl. ¶ 21.  Ms. Carter-Miller asserts that she received poor information on operating procedures at Overlake.  Carter-

ORDER – 4

Miller Decl. ¶¶ 48-52, 57-62. She does not, however, allege that this is the fault of anyone at BCC. Indeed, her complaints focus on the inadequacies of the Overlake employee who complained about her, although neither Overlake nor the employee are parties to this lawsuit. Carter-Miller Decl. ¶¶ 57-62.

In Ms. Carter-Miller's view, the "last straw" was BCC's response in the aftermath of an April 2007 incident involving her and her students. Carter-Miller Depo. at 53:21-24. Ms. Carter-Miller discovered that a student had failed to bathe and feed a patient. Carter-Miller Decl. ¶¶ 84-86. On April 27, she told Shelly Thompson, a student who served as a "peer resource" for other students in the ADNP, "something about being so upset that I could decapitate [the student]." Carter-Miller Decl. ¶ 89; Carter-Miller Depo. at 87:2-10. According to Ms. Thompson, Ms. Carter-Miller told her that she "needed [her] to speak [to the student] because if I do, I will decapitate her." Thompson Decl. ¶ 7. Although Ms. Carter-Miller characterizes the statement as "hyperbole," Carter-Miller Decl. ¶ 89, the students involved perceived it as a threat. Ms. Thompson told the other student that Ms. Carter-Miller wanted to "decapitate [her] and kick [her] out of the program." Yim Decl. ¶ 9. Ms. Thompson told Ms. Weber of the perceived threat on May 1. Thompson Decl. ¶ 10; Weber Decl. ¶ 6. The student at the center of the incident wrote Ms. Karnes and explained that Ms. Carter-Miller had "taken it too far by physically threatening me and other classmates." Carter-Miller Decl., Ex. 12. The student also met with Ms. Weber and discussed her fear of Ms. Carter-Miller. Weber Decl. ¶¶ 7-8.

Ms. Weber communicated the threat to her superiors, and that communication requires extended discussion. She and Dean Leatherbarrow first spoke on the telephone on May 2, although she may have left him a voice message on May 1. Leatherbarrow Depo. at 96; Leatherbarrow Decl. ¶¶ 5-6. In their declarations, both Ms. Weber and Dean Leatherbarrow unambiguously state that Ms. Weber did not identify the instructor involved in the situation in her communications with Dean Leatherbarrow. Leatherbarrow Decl. ¶ 6; Weber Decl. ¶ 10. It is undisputed that Ms. Weber also

ORDER – 5

contacted Dr. McKinnon by e-mail on May 2, describing the situation without identifying Ms. Carter-Miller. Weber Decl. ¶ 9 & Ex. 1. Dr. McKinnon, who was on medical leave, replied by e-mail stating that Ms. Weber was "doing the right thing" by talking with Dean Leatherbarrow. *Id.* She also asked Ms. Weber for the identity of the instructor. *Id.* Dr. McKinnon states that she did not learn that Ms. Carter-Miller was the instructor involved until after her return to campus in June 2007. McKinnon Decl. ¶¶ 47-48.

On May 2, Dean Leatherbarrow directed Ms. Weber to cancel Ms. Carter-Miller's classes for the remaining two days of the week. Leatherbarrow Decl. ¶ 7; Weber Decl. ¶¶ 9-10. Ms. Weber informed Ms. Carter-Miller of the decision. Carter-Miller Depo. at 93:2-23. Dean Leatherbarrow did not communicate with Ms. Carter-Miller before making the decision. Carter-Miller Decl. ¶¶ 99-100. It is undisputed that when Dean Leatherbarrow decided to cancel the two days of classes, he "knew neither the name nor race of Loretta Carter-Miller." Leatherbarrow Decl. ¶ 7; Weber Decl. ¶ 10.

Despite this undisputed evidence, Ms. Carter-Miller accuses Dean Leatherbarrow and Ms. Weber of "duplicity" and "fabrication" in their declarations that Dean Leatherbarrow knew the identity of the instructor when he made the cancellation decision. Carter-Miller Opp'n at 27-28. She has no evidence to support those serious charges. She points to excerpts of Dean Leatherbarrow's deposition, in which he repeatedly uses Ms. Carter-Miller's name when discussing his communications with Ms. Weber on May 2. Parisien Decl., Ex. 6 at 96:4-99:3. Nowhere in these excerpts does Dean Leatherbarrow discuss whether he knew, on May 2, that Ms. Carter-Miller was the instructor involved. By the time of his deposition, he knew Ms. Carter-Miller was the instructor involved. That he used her name at the deposition is not evidence of duplicity. The court also notes Dr. McKinnon's declaration that Dean Leatherbarrow "was aware that Ms. Carter-Miller was African-American before the clinical cancellation," based on conversations they had previously. McKinnon Decl. ¶ 39. Ms. Carter-Miller does not cite this evidence, perhaps because it does not bear on whether Dean Leatherbarrow knew

ORDER – 6

the *identity* of the instructor whose classes he cancelled. If he did not know the identity of the instructor, he did not know her race. In her statements about the cancellation, Dr. McKinnon says nothing about whether Dean Leatherbarrow knew on or before May 2 that Ms. Carter-Miller was the instructor who had made the threat. Given Dr. McKinnon's medical absence from campus, it is unlikely that she has any personal knowledge about the content of Dean Leatherbarrow's conversations with Ms. Weber on May 1 and May 2.[2]

For these reasons, the court concludes that it is undisputed that Dean Leatherbarrow did not know the identity or the race of the instructor whose classes he cancelled. If Ms. Carter-Miller wishes to provide additional evidence on this issue, whether in the form of an unexcerpted transcript of Dean Leatherbarrow's deposition, or evidence from Dr. McKinnon evidencing her personal knowledge of Dean Leatherbarrow's conversations with Ms. Weber on May 2, the court will consider such evidence, subject to standards applicable to motions for reconsideration.

Ms. Weber informed students of the cancellation of classes in a May 2 e-mail. Thompson Decl. ¶ 12, Ex. 2. The one-sentence e-mail did not state the reasons for the cancellation, did not mention Ms. Carter-Miller, and explained that the classes would be rescheduled. *Id.* On May 2, 2007, Ms. Carter-Miller sent her students an e-mail stating that the cancellation was a result of the student's "concern that I intend to do her bodily harm and [because] she fears me." Thompson Decl. ¶ 11, Ex. 1.

There is no evidence that Dean Leatherbarrow and Ms. Carter-Miller ever discussed the cancellation. Although Ms. Carter-Miller contends that Dean Leatherbarrow did not request a meeting with her until May 15, Carter-Miller Decl. ¶ 103, she admitted in a contemporaneous e-mail that he had requested a meeting as early as May 9. Carter-Miller Decl. ¶ Ex. 16. They met on May 15, but Ms. Carter-Miller

---

[2] Ms. Carter-Miller also pays much attention to whether Dean Leatherbarrow told Ms. Weber to attempt to contact both Dr. McKinnon and Ms. Felton about the situation before he made his decision. The court finds this dispute irrelevant.

terminated the meeting when he attempted to explain his reason for cancelling the classes. Carter-Miller Depo. at 94:21-95:25.

Beyond these incidents that involve Ms. Carter-Miller directly, there is some evidence from witnesses other than Ms. Carter-Miller regarding race-based concerns about the ADNP generally. Ms. Felton describes the climate for faculty of color in the ADNP as "chilly," Felton Decl. ¶ 25, and concludes that "almost none of the nursing faculty has changed their attitudes or behaviors that continue to negatively impact the success of students and faculty of color." Felton Decl. ¶ 30. She also states that two ADNP employees of color (one tenure-track African-American faculty member and one Filipino instructor) left the program before Ms. Carter-Miller began her employment. Felton Decl. ¶¶ 27-29; *see also* McKinnon Decl. ¶ 46 (describing Filipino instructor's complaints regarding a faculty member not involved in this action). Ms. Felton does not declare that any of the actors involved in this lawsuit were involved in their departures. Dr. McKinnon claims that there were complaints of race discrimination, prior to Ms. Carter-Miller's employment, against another nursing instructor not involved in this action. McKinnon Decl. ¶ 45. According to Dr. McKinnon, "Ms. Tedeschi and Ms. Karnes had problems dealing with people of color." McKinnon Decl. ¶ 36. Both "engaged in racial stereotyping of students of color and those who spoke English as a second language." *Id.* ¶ 37. She also believes that before she arrived at BCC, nursing program leadership "was not receptive to people of color." *Id.* ¶ 40.

Finally, Ms. Carter-Miller submits evidence of racially-charged incidents that have occurred at BCC outside the nursing program. The court reserves a detailed discussion of those incidents for its later analysis. For now, it suffices to remark that they range from an incident in which someone wrote a racial epithet on a student's car windshield, to complaints about student and faculty conduct in various classes outside the ADNP, to efforts by concerned students and faculty to address racism on the BCC campus. None of these incidents involved Ms. Carter-Miller, and none of them involved any ADNP

ORDER – 8

instructors, faculty members, or students.  Many of them occurred either before or after Ms. Carter-Miller's tenure at BCC.  Ms. Carter-Miller declares that she "became aware" of some of these incidents while she was still at BCC, Carter-Miller Decl. ¶ 110, but she provides no evidence that the incidents had any impact on her whatsoever.

Despite the conduct that Ms. Carter-Miller describes, she worked under a new contract as an ADNP instructor in summer 2007.  The record is silent about when Ms. Carter-Miller requested or applied for the summer term employment.  The record is also silent as to whether Ms. Carter experienced any unwelcome conduct or incidents during the summer term.  Ms. Carter-Miller did not apply for any other jobs at BCC.  At some point between January 2007 and the May cancellation of her classes, she asked Dr. McKinnon about being hired for the next academic year.  Carter-Miller Depo. at 54-55; Decl. at ¶ 46.  Dr. McKinnon wanted her to return.  McKinnon Decl. ¶ 8.  In a May 2007 meeting following the cancellation incident, Dr. Bennett "encouraged [her] to stay" at BCC.  Carter-Miller Decl. ¶ 47.  Ms. Carter-Miller said that if she "were to stay, [she] needed to be assigned to another division and out of nursing." *Id.*  Ms. Carter-Miller never applied for another job at BCC.  It is not apparent from the record when Ms. Carter-Miller decided that she no longer wanted to work there.

## III.  ANALYSIS

Ms. Carter-Miller alleges that Defendants engaged in race discrimination by disparate treatment, created a racially hostile work environment, and retaliated against her for her complaints of discrimination.  She uses three statutory schemes to advance these claims:  42 U.S.C. § 1981, Title VI of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000d-2000d-7), and the Washington Law Against Discrimination ("WLAD").  Defendants seek summary judgment on each of her claims.

On a motion for summary judgment, the court must draw all inferences from the admissible evidence in the light most favorable to the non-moving party.  *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).  Summary judgment is appropriate

ORDER – 9

where there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party must initially show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The opposing party must then show a genuine issue of fact for trial. *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present probative evidence to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991). The court defers to neither party in resolving purely legal questions. *See Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999).

The court will turn to Ms. Carter-Miller's claims under § 1981 and the WLAD after addressing a threshold legal concern with her attempt to invoke Title VI.

**A. Ms. Carter-Miller Cannot Invoke Title VI to Seek Redress for Employment Discrimination.**

Ms. Carter-Miller cannot bring Title VI employment discrimination claims because she has no evidence that BCC received federal funding that had a "primary objective" of providing employment. Section 601, the first section of Title VI, uses broad language targeting discrimination in programs that receive federal funding:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d-3. Section 604, however, limits the use of Title VI as a means of redressing discriminatory employment practices:

> Nothing contained in this title shall be construed to authorize action under this title by any department or agency with respect to any employment practice of any employer, employment agency, or labor organization *except where a primary objective of the Federal financial assistance is to provide employment.*

ORDER – 10

42 U.S.C. § 2000d-3 (emphasis added). The limitation expressly applies to actions by "department[s] or agenc[ies]," but the Ninth Circuit and other courts construe the limitation to apply to individuals as well. *Temengil v. Trust Terr. of Pac. Islands*, 881 F.2d 647, 653 (9th Cir. 1989); *Reynolds v. Sch. Dist. No. 1*, 69 F.3d 1523, 1531 n.8 (10th Cir. 1995) (citing *Temengil* and similar cases).[3]

Ms. Carter-Miller has no evidence that BCC employed her using federal funds whose primary objective was providing employment.[4] Instead, Ms. Carter-Miller asserts that she need not point to funding that satisfies Section 604 because she can rely upon an "infection theory" to invoke Title VI. Carter-Miller Opp'n at 20. She misunderstands the "infection theory," a phrase that has been used to describe certain Title VI enforcement efforts by federal agencies. For example, in the case from which Ms. Carter-Miller borrows the phrase "infection theory," the court approved a Department of Health, Education and Welfare[5] ("HEW") enforcement action targeting a school board's practices in hiring minority teachers. *Caulfield v. Bd. of Educ. of New York*, 486 F. Supp. 862, 876 (E.D.N.Y. 1979). The court found that despite Section 604, the agency could bring a Title VI enforcement action because discrimination in hiring and retention of minority teachers affected students. *Id.* Discrimination against students, unlike discrimination against employees, is beyond the scope of the Section 604 limitation. *Id.* Courts have adopted similar reasoning in considering other federal agency enforcement actions. *E.g.*, *United States v. Jefferson County Bd. of Educ.*, 372 F.2d 836, 883 (5th Cir. 1966)

---

[3] Ms. Carter-Miller raises no claims under Title VII of the Civil Rights Act of 1964, which directly prohibits the practices of which she complains. This is perhaps because she failed to exhaust her administrative remedies, a necessary prerequisite to a Title VII claim. As the Supreme Court has noted, Title VI was not intended to impinge on Title VII. *Johnson v. Transp. Agency of Santa Clara County*, 480 U.S. 616, 628 n.6 (1987).

[4] Ms. Felton's declaration contains a description of some federal funding that ADNP receives. Felton Decl. ¶¶ 36-37. Ms. Carter-Miller does not cite this evidence in her brief, and she makes no attempt to demonstrate that this funding would qualify her to invoke Title VI.

[5] The Department of Health, Welfare, and Education was a cabinet-level federal executive agency until the Department of Education Organization Act split it into the Department of Health and Human Services and the Department of Education in 1979. 20 U.S.C. §§ 3401-3510.

ORDER – 11

(upholding HEW enforcement action); *Ahern v. Bd. of Educ. of Chicago*, 133 F.3d 980, 983 (7th Cir. 1998) (considering, but not deciding, whether school principals were intended beneficiaries of consent decree between HEW and school board).

So far as the court is aware, no court has ever permitted an individual employee to invoke similar reasoning to bring an employment discrimination claim on his or her own behalf. Courts have invoked the "infection theory" or its equivalent only in discussing enforcement actions by federal agencies. Moreover, Ms. Carter-Miller offers no explanation of how she has standing to assert the rights of students at BCC. The court cannot countenance an end run around Section 604 under these circumstances.

Finally, although the court cannot discern the meaning of Ms. Carter-Miller's unexplained citation to a Department of Education regulation codifying a version of the "infection theory," Carter-Miller Opp'n at 20, she cannot invoke the regulation on her own behalf. The regulation provides as follows:

> Where a primary objective of the Federal financial assistance is not to provide employment, but discrimination on the ground of race, color, or national origin in the employment practices of the recipient or other persons subject to the regulation tends, on the ground of race, color, or national origin, to exclude individuals from participation in, to deny them the benefits of, or to subject them to discrimination under any program to which this regulation applies, the foregoing provisions of this paragraph (c) shall apply to the employment practices of the recipient or other persons subject to the regulation, to the extent necessary to assure equality of opportunity to, and nondiscriminatory treatment of, beneficiaries.

34 C.F.R. § 100.3(c)(3). The Department of Education promulgated this regulation under Section 602 of Title VI (42 U.S.C. § 2000d-1), which authorizes federal agencies to regulate entities that they fund to ensure compliance with Section 601. *See Powell v. Ridge*, 189 F.3d 387, 392-93 (3d Cir. 1999). The Supreme Court has held, however, that there is no private right of action to enforce such regulations. *Alexander v. Sandoval*, 532 U.S. 275, 293 (2001). Ms. Carter-Miller's attempt to invoke the regulation fails for at least that reason.

ORDER – 12

**B.    Ms. Carter Miller's Disparate Treatment Discrimination Claims Fail.**

Whether applying § 1981 or the WLAD, courts examining disparate treatment claims apply the same standards that apply to equivalent claims under Title VII of the Civil Rights Act of 1964. *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 850 (9th Cir. 2004) (noting that "the same legal principles as those applicable in a Title VII disparate treatment case" apply to § 1981 claims); *Xieng v. Peoples Nat'l Bank of Wash.*, 844 P.2d 389, 392 (Wash. 1993) (applying Title VII standards to WLAD disparate treatment claim). A plaintiff opposing a summary judgment motion can provide "direct or circumstantial evidence that a discriminatory reason more likely than not motivated the employer." *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004). Alternatively, the plaintiff can use the *McDonnell Douglas* burden-shifting framework. *Id.* at 1122 & n.16 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973)). In that case, a plaintiff must first make out a prima facie case of discrimination. *Id.* at 1122 n. 16. If she succeeds, the burden shifts to the employer to provide evidence of a non-discriminatory reason for its conduct. *Id.* If the employer meets this burden, the plaintiff must provide evidence that the employer's proffered reason is pretextual. *Id.*

Ms. Carter-Miller does not explain if she is invoking the *McDonnell Douglas* framework. She cites cases that discuss both the direct proof of discrimination and the *McDonnell Douglas* approach. Carter-Miller Opp'n at 12-13. Her discussion invokes phrases from the *McDonnell Douglas* framework, but makes no particular effort to follow it. The court applies the *McDonnell Douglas* analysis to her claims, a choice that does not affect the court's disposition. *See McGinest*, 360 F.3d at 1122 (applying *McDonnell Douglas* test where parties did not agree on framework for disparate treatment claim).

**1.    With One Possible Exception, Ms. Carter-Miller Has Not Made Out a Prima Facie Case of Disparate Treatment.**

A plaintiff opposing summary judgment establishes a prima facie case of disparate treatment when she produces evidence from which a jury could conclude that "(1) she

ORDER – 13

belongs to a protected class, (2) she was performing according to her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) other employees with qualifications similar to her own were treated more favorably." *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998).  Ms. Carter-Miller belongs to a protected class, and the court is willing to assume for purposes of this order that she performed according to BCC's legitimate expectations.  She lacks evidence to support at least one of the remaining elements of a prima facie case.

With one possible exception, Ms. Carter-Miller fails to make a prima facie case of employment discrimination because she cannot point to an adverse employment action.  An adverse employment action is one that "materially affect[s] the compensation, terms, conditions, or privileges of employment." *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008).  When the court uses the phrase "adverse employment action" in this section, it means "adverse employment action" in the context of a disparate treatment claim.  The phrase has a broader meaning in the context of a retaliation claim, as the Supreme Court explained in *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-68 (2006).  The Court reached that conclusion after concluding that the anti-retaliation provisions of Title VII encompass a broader range of conduct than the anti-discrimination provisions of Title VII.  Although the *Burlington Northern* Court had no occasion to define "adverse employment action" for purposes of a disparate treatment claim, it unambiguously indicated that it is less broad than the definition it adopted for "adverse employment action" in a retaliation claim.  *Id.* at 67-68.

Before reviewing the evidence in search of an adverse employment action, the court notes that Ms. Carter-Miller has made little effort to explain which of the many incidents she describes are intended to support her claims of disparate treatment, as opposed to her claims for retaliation or a hostile work environment.  The court has therefore reviewed the record in search of any act that would constitute an adverse employment action for purposes of her disparate treatment claim.

ORDER – 14

Ms. Carter-Miller does not allege, much less demonstrate with evidence, that BCC terminated her employment, declined to rehire her, denied her a promotion, modified her pay or benefits, or assigned her extra hours or responsibilities. Indeed, BCC rehired Ms. Carter-Miller for the only additional job she applied for, the summer 2007 instructor position. The unchallenged evidence is that BCC likely would have rehired Ms. Carter-Miller a second time if she had chosen to apply for another year's employment. Carter-Miller Decl. ¶ 47 ("Dr. Bennett encouraged me to stay [at BCC]."), ¶ 109. Thus, if Ms. Carter-Miller is to prove an adverse employment action, it will be an action that did not shorten her employment, affect her chances for rehire, decrease her pay or benefits, or increase her workload, but nonetheless "materially affect[ed] the compensation, terms, conditions, or privileges of [her] employment." *Davis*, 520 F.3d at 1089. The court's review of the record reveals that, with one possible exception, BCC took no adverse employment actions against her.

In November 2006, when Ms. Tedeschi gave Ms. Carter-Miller the document she prepared detailing concerns from other faculty and students, she did not subject her to an adverse employment action. Although negative performance reviews can be adverse employment actions in some circumstances, a review prepared by a faculty member with no supervisory authority that results in no adverse consequences for the employee is not an adverse action. *Kortan v. Cal. Youth Authority*, 217 F.3d 1104, 1113 (9th Cir. 2000). Ms. Carter-Miller has provided no evidence that Ms. Tedeschi gave the document to anyone with supervisory authority, nor that the document had any adverse impact on her employment. The court acknowledges evidence that the document had an adverse impact on Ms. Carter-Miller – the evidence suggests that it upset her greatly.[6] Purely personal impact, however, does not suffice to show an adverse employment action in this context.

Ms. Tedeschi's "snow day" e-mail in November 2006 is also not an adverse employment action. The court flatly rejects the notion that causing an employee to come

---

[6] The document Ms. Tedeschi prepared is not part of the record before the court.

ORDER – 15

to work unnecessarily on one occasion is an adverse employment action. In addition, undisputed evidence reveals that while the e-mail came too late to spare Ms. Carter-Miller an unnecessary commute to BCC, it also came too late for some of the students to whom it was sent. Ms. Carter-Miller offers no evidence to explain how an e-mail that caused the same harm to her and some of her students could have been sent with an intent to discriminate against her on the basis of her race.

Ms. Karnes' appearance and one-day usurpation of Ms. Carter-Miller's classroom authority at Overlake Hospital in February 2007 is also not an adverse employment action. Again, while the incident seems to have aggravated Ms. Carter-Miller, it did not materially affect the terms and conditions of her employment.

The court also finds no adverse employment action arising out of either Ms. Carter-Miller's students' complaints or the manner in which ANDP staff members addressed those complaints. At worst, those complaints were communicated to Ms. Carter-Miller in an unprofessional manner. She suffered no adverse employment consequences as a result of the complaints.

The court also finds that the inadequate mentoring that Ms. Carter-Miller received is not an adverse employment action. Again, the court accepts Ms. Carter-Miller's assertions that this aggrieved her personally, but there is no evidence that it affected her professionally. Whether because she relied on mentoring from Ms. Felton and Dr. McKinnon or for reasons owing to her own resourcefulness, she met her supervisors' expectations despite the inadequate mentoring she received from some ADNP faculty.

Although the court declines to recount all of the many slights from Ms. Tedeschi, Ms. Weber, and Ms. Karnes that Ms. Carter describes in her 35-page declaration, none of them rise to the level of an adverse employment action. She describes conduct on behalf of Ms. Tedeschi, Ms. Karnes, and Ms. Weber that was, in her words, "chilly, snotty, and unwelcoming." But, as courts often observe, laws targeting employment discrimination are not intended to serve as a "general civility code for the American workplace."

*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998). Even under the broader definition of "adverse employment action" that applies to retaliation claims, not "every offensive utterance by co-workers" is actionable. *Ray v. Henderson*, 217 F.3d 1234, 1243 (9th Cir. 2000). It suffices to remark that although a reasonable jury considering evidence of slights from Ms. Tedeschi, Ms. Karnes, and Ms. Weber could conclude that it was unpleasant for Ms. Carter-Miller to work with them, no reasonable jury could find that those slights were adverse employment actions.[7]

The sole act that might constitute an adverse employment action is the cancellation of Ms. Carter-Miller's courses for two days in the aftermath of her "decapitation" comment. The court notes that there is no evidence that Ms. Carter-Miller's pay was docked or that she was subject to other disciplinary action. There is no evidence that the incident was documented in her permanent record. The record suggests that Ms. Carter-Miller taught make-up classes at the end of the quarter to substitute for the canceled classes. On this record, it is not clear that the cancellation "materially affect[ed] the compensation, terms, conditions, or privileges of [her] employment." *Davis*, 520 F.3d at 1089. Nonetheless, rather than risk drawing too fine a line between actionable and non-actionable conduct in the disparate treatment context, the court is willing to assume for purposes of this order that the cancellation was an adverse employment action.

The court is also willing to overlook that Ms. Carter-Miller offers no evidence that similarly-situated BCC faculty members were treated more favorably than her in a situation like the one following her "decapitation" comment. It may well be that no BCC instructor has made such a comment and had it conveyed to administrators by a student who felt threatened.

The court has no difficulty concluding, however, that Defendants have offered evidence of a non-discriminatory reason for temporarily cancelling Ms. Carter-Miller's

---

[7] In Part III.C, *infra*, the court considers whether these slights, in conjunction with other circumstances, give rise to a hostile work environment.

ORDER – 17

classes.  To summarize the situation, concerns about the comment were conveyed through two students to Ms. Weber, who then relayed the concerns to Dean Leatherbarrow without using Ms. Carter-Miller's name.  Dean Leatherbarrow ultimately decided on the two-day cancellation of courses, and there is no evidence that he was aware of whose courses he was cancelling when he made the decision.  Not only is a perceived threat from a teacher against a student a legitimate basis for a temporary cancellation of her classes, Dr. Leatherbarrow was undisputedly unaware of the identity or race of the instructor whose courses he was cancelling.  *See Vasquez v. County of Los Angeles*, 349 F.3d 634, 640 (9th Cir. 2003) (holding that plaintiff must provide evidence of discrimination by the decisionmaker, not subordinates).

For the same reasons, Ms. Carter-Miller has no evidence that Dean Leatherbarrow's explanation for cancelling the classes was pretextual or otherwise unworthy of credence.  While a reasonable jury could debate whether Dean Leatherbarrow overreacted to the information he was presented, or whether he should have undertaken additional investigation, no reasonable juror could find that his rationale was a pretext to hide his discriminatory motives.  He undisputedly did not know the identity of the instructor whose classes he had cancelled, and thus did not know her race.

## C.  The Court Requires Additional Briefing on Ms. Carter Miller's Hostile Work Environment Claim.

In some cases, a series of actions that are not adverse employment actions can collectively constitute a hostile work environment.  To prove a hostile work environment, a plaintiff must show that she was the target of verbal or physical conduct because of her race, that the conduct was unwelcome, and that the conduct was sufficiently severe or pervasive to alter the conditions of her employment.  *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1122 (9th Cir. 2008) (applying § 1981); *Robel v. Roundup Corp.*, 59 P.3d 611, 616 (Wash. 2002) (applying WLAD to claim of disability-motivated hostile work environment); *see also Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

ORDER – 18

Unlike a disparate treatment claim, which requires an adverse employment action, a hostile environment claim focuses on the cumulative effect of a series of actions, where the individual actions are not adverse employment actions. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002); *Porter v. Cal. Dep't of Corr.*, 383 F.3d 1018, 1027-28 (9th Cir. 2004), *amended by* 419 F.3d 885 (9th Cir. 2005). The environment must be both objectively and subjectively hostile. *Davis*, 520 F.3d at 1095. The factfinder judges the "objective hostility" of the workplace "from the perspective of a reasonable person belonging to the racial or ethnic group of the plaintiff." *McGinest*, 360 F.3d at 1115.

In addition to establishing a hostile work environment, a plaintiff must show that her employer can be held responsible for the hostile environment. *Id.* at 1119 (requiring court to first assess whether a hostile environment existed, then determine whether employer's "response was adequate as a whole"). An employer is presumptively responsible if supervisors engaged in harassing conduct. *Id.* (citing *Swinton v. Potomac Corp.*, 270 F.3d 794, 803 (9th Cir. 2001), and noting affirmative defense available to employers in such cases). Where non-supervisor co-workers committed the acts that caused the hostile work environment, the plaintiff must show that the employer knew or should have known about the hostile environment and failed to take adequate remedial and disciplinary action. *Id.*; *Davis*, 520 F.3d at 1095.

### 1. A Reasonable Jury Could Find Ms. Carter-Miller's Work Environment Hostile.

The court finds that a reasonable jury could conclude that some of the conduct Ms. Carter-Miller complains of was racially motivated. This finding does not extend to Dean Leatherbarrow's decision to cancel Ms. Carter-Miller's classes, as the undisputed evidence shows that action was race-neutral.[8] It also does not apply to Ms. Tedeschi's "snow day" e-mail. It defies logic to imagine that an e-mail sent to Ms. Carter-Miller and

---

[8] The evidence reveals, moreover, that it was Ms. Carter-Miller, not Dean Leatherbarrow or any other BCC employee, who revealed to her students the reason that her classes were cancelled. Thompson Decl. ¶ 11, Ex. 1.

ORDER – 19

all students cancelling classes could somehow have been targeted at Ms. Carter-Miller because of her race. As to Ms. Tedeschi, Ms. Weber, and Ms. Karnes, there is evidence from which a jury could conclude that they disliked Ms. Carter-Miller, and made her work environment unpleasant. The only direct evidence of any racial bias in these women is Dr. McKinnon's assertion that Ms. Tedeschi and Ms. Karnes had "problems dealing with people of color" and engaged in racial stereotyping of students. McKinnon Decl. ¶¶ 36-37. Although Ms. Felton uses her declaration to describe behavior she found unacceptable from Ms. Tedeschi and Ms. Karnes, she never attributes that behavior to racial bias. There is, however, circumstantial evidence that Ms. Tedeschi and Ms. Karnes provided better mentoring and less intrusive joint instruction to two or three other new ADNP instructors, rather than Ms. Carter-Miller. As to Ms. Weber, there is no evidence that her conduct toward Ms. Carter-Miller was racially motivated. Although the evidence of racial motivation is spotty, there is sufficient evidence from which a jury could find some racially-motivated unwelcome conduct directed at Ms. Carter-Miller.

A reasonable jury could also conclude that Ms. Carter-Miller's work environment was objectively hostile. The possibly racially-motivated incidents Ms. Carter-Miller describes, when considered cumulatively, support an inference that a reasonable person in Ms. Carter-Miller's shoes would have been unwilling to continue working in the ADNP. Whether these incidents were sufficiently severe and pervasive to be objectively hostile is a close call, but "in close cases such as this one, where the severity of frequent abuse is questionable, it is more appropriate to leave the assessment to the fact-finder than for the court to decide the case on summary judgment." *Davis*, 520 F.3d at 1096.

A reasonable jury could also conclude that Ms. Carter-Miller's work environment was subjectively hostile. The evidence on this issue is also extremely close. Prior to the May 2007 cancellation of her classes, Ms. Carter-Miller told Dr. McKinnon that she wanted to return to teach at BCC because she felt that "people were being bitchy," but that "[she] could handle it." Carter-Miller Depo. at 57:5-13. The only event to which she

ORDER – 20

points after that discussion was Dean Leatherbarrow's May 2007 decision to cancel her classes. Although she viewed that action as "the last straw," that action undisputedly had no racial motivation. Moreover, after the "last straw," Ms. Carter-Miller began and completed her second contract to teach during the summer of 2007. She offers no evidence of unwelcome conduct during that quarter. Still, the record reflects that while Ms. Carter-Miller likely could have returned under a new contract to teach at BCC, she chose not to. Whether her choice is attributable to racially-motivated hostile conduct or to other factors is not a dispute that the court can resolve on summary judgment. Her decision to leave BCC, in addition to other evidence described above, would permit a jury to find that hostile conduct " pollute[d] [her] workplace, making it more difficult for her to do her job, to take pride in her work, and to desire to stay on in her position." *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1463 (9th Cir. 1994).[9]

The court's conclusion that a jury could find Ms. Carter-Miller's work environment both objectively and subjective hostile is based solely on evidence of conduct directed at Ms. Carter-Miller and evidence regarding the persons who directed that conduct at her. Ms. Carter-Miller also places substantial reliance on two other categories of evidence: evidence of racially-motivated conduct within the ADNP but having no apparent connection to Ms. Carter-Miller, and evidence of racially-motivated conduct at BCC generally. The court is mindful of this evidence, but finds it to be either irrelevant to Ms. Carter-Miller's claims or to have *de minimus* impact at best.

The record contains evidence suggesting that *prior to Ms. Carter-Miller's employment*, two instructors of color left the ADNP in the wake of race-based conflicts

---

[9] The court reaches this conclusion even though it gives no weight to a declaration Ms. Carter-Miller submitted from a physician who diagnosed her with depression. Olsen Decl. The physician does not state whether he treated Ms. Carter-Miller (as opposed to merely diagnosing her), much less whether he treated her during her time at BCC. Ms. Carter-Miller claims that she began seeing a psychiatrist in July 2007, two months after the last occurrence she complains of in this action. Carter-Miller Decl. ¶ 109. Whether the psychiatrist she saw is the physician who submitted the declaration, the record does not reveal. Indeed, the physician's declaration does not even state the physician's specialty. In any event, the physician's declaration does nothing to illuminate Ms. Carter-Miller's state of mind at the time she was working at BCC.

ORDER – 21

with other employees.  The evidence does not, however, permit any reasonable juror to either understand the conditions that led to those departures or to infer that the Ms. Carter-Miller experienced the same conditions.  The departed faculty had conflicts with ADNP faculty members who, so far as the record reveals, had no interaction with Ms. Carter-Miller at all.  The evidence also shows that the BCC nursing program hired a consultant in spring 2005 to help it address diversity issues.  None of that evidence, however, explains what bearing that decision had on Ms. Carter-Miller's employment more than a year later.  There is no evidence that Ms. Carter-Miller was even aware of these historical events while she was working at BCC.

Other evidence goes well beyond the ADNP, and well beyond Ms. Carter-Miller's employment environment.  In April 2006, before Ms. Carter-Miller came to BCC, an uproar arose over a math instructor's use of a racially insensitive question on an exam. Although the incident preceded Ms. Carter-Miller's employment, controversy over the disciplinary action taken against the instructor continued and overlapped with Ms. Carter-Miller's tenure.  Still, there is no evidence that the controversy impacted her work environment in the ADNP.  Indeed, the only evidence connecting this incident and its aftermath to Ms. Carter-Miller is her declaration that she was "aware" of it.  Carter-Miller Decl. ¶ 110.  In April 2007, a BCC student (apparently not an ADNP student) found a racial epithet written on his car in a school parking lot.  There is no evidence whatsoever that Ms. Carter-Miller was even aware of this incident, much less that it impacted her work environment.  In a March 2007 sign language class, a student asked the instructor how to sign a racial epithet.  There is no evidence that Ms. Carter-Miller was aware of this incident until after the May 2007 cancellation of her classes, when one of the students who had attended the sign language class spoke to her about the incident.  Bailey Decl. ¶ 32.  There is no evidence about what impact, if any, the conversation with the student had on Ms. Carter-Miller's work environment.  Ms. Carter-Miller was "aware" of heated exchanges of e-mails in April 2007 centering around BCC's "Diversity Caucus."

ORDER – 22

So far as the record reveals, these exchanges had nothing to do with ADNP, and had no apparent impact on Ms. Carter-Miller's work environment. One of the founders of the Diversity Caucus provided a declaration regarding diversity issues at BCC. Lum Decl. Nothing in the declaration refers to Ms. Carter-Miller, her working conditions at ADNP, or any ADNP member. An employee who has worked for seven years in enrollment services, human resources, and career services at BCC complains that *she* has experienced a hostile work environment – but she works for different supervisors in a different department. Russell Decl. There is no evidence that Ms. Carter-Miller was aware of this employee's working conditions, much less that they impacted Ms. Carter-Miller's working conditions.

The evidence described in the previous paragraph is either wholly unconnected to Ms. Carter-Miller or tenuously connected. In circumstances not present here, racial attacks targeted at persons other than the plaintiff can affect the plaintiff's work environment. *See Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1033-34 (9th Cir. 1998) (citing cases). In this case, whatever conclusions a juror might draw about race relations at BCC after considering this evidence, no reasonable juror could conclude that these incidents had more than a *de minimus* impact on Ms. Carter-Miller's work environment. She was not a student at BCC; she was not an employee outside of BCC's ADNP. Although in some instances she may have been aware of suspect conduct involving other actors and other academic departments, there is little basis to conclude that this conduct affected her working conditions. Indeed, Ms. Carter-Miller was apparently not concerned about the work environment *outside of the ADNP*, because when Dr. Bennett encouraged her to stay at BCC in the wake of the May 2007 class cancellation, she asked to be "assigned to another division out of nursing." Carter-Miller Decl. ¶ 47. Although the court need not make determinations regarding the admissibility of this evidence now, the court notes that it has not relied on it whatsoever in reaching its conclusion that a jury could find Ms. Carter-Miller's work environment to be hostile.

ORDER – 23

### 2. The Record is Insufficient Regarding Whether BCC Can Be Held Liable for the Allegedly Hostile Work Environment.

Ms. Carter-Miller must also point to evidence that would make BCC liable for her hostile work environment. There is no evidence that anyone with supervisory authority over her is responsible for any racially-motivated conduct. Although Ms. Weber was chair of the ADNP, there is no evidence that she had supervisory power. Ms. Tedeschi and Ms. Karnes undisputedly had no supervisory power. Dr. McKinnon was Ms. Carter-Miller's "immediate supervisor," McKinnon Decl. ¶ 10, but there is no evidence that Dr. McKinnon engaged in inappropriate conduct. Dean Leatherbarrow and other administrators, including Dr. Bennett, may have had supervisory authority, but there is no evidence that they engaged in any racially-motivated conduct.

Because no supervisor engaged in racially-motivated conduct, Ms. Carter-Miller must prove that supervisors knew or should have known about her hostile work environment and failed to take adequate remedial or disciplinary action. *McGinest*, 360 F.3d at 1119; *Davis*, 520 F.3d at 1095. The record is silent as to what her supervisors should have known. There is evidence that she made complaints of discrimination to Dr. McKinnon, Dr. Bennett, and Ms. Felton. Carter-Miller Decl. ¶¶ 38, 43, 47, 107; Felton Decl. ¶ 6. Dr. McKinnon also spoke with Dean Leatherbarrow about her. McKinnon Decl. ¶ 39. Ms. Felton is not a supervisor, and there is no evidence that she communicated Ms. Carter-Miller's complaints to any supervisor until May 2007, when she met with Dean Leatherbarrow and others in the aftermath of the class cancellation. ¶¶ 17-19. In any event, the evidence regarding what the supervisors knew about Ms. Carter-Miller's working conditions is woefully non-specific. The court has little idea what these supervisors were told, when they were told, or what remedial action Ms. Carter-Miller or her surrogates requested. There is evidence that Dr. McKinnon met with Ms. Karnes in March 2007 regarding the situation, and that Ms. Carter-Miller's relationship with Ms. Karnes improved thereafter. McKinnon Decl. ¶ 19. She attempted,

ORDER – 24

but failed, to schedule a meeting with Ms. Tedeschi. *Id.* There is little evidence regarding what Dr. McKinnon did at this meeting, much less what she did to take remedial action with respect to Ms. Karnes and Ms. Weber. Although there is no evidence that Dr. Bennett or Dean Leatherbarrow took any remedial action, there is also no evidence that they had information that would have required them to take remedial action.[10]

On this record, the court has no basis to assess whether Dr. McKinnon, Dr. Bennett, Dean Leatherbarrow, or any other supervisor knew about her hostile work environment, nor whether their action or inaction was adequate under the circumstances. The court therefore orders Ms. Carter-Miller to provide a supplemental brief addressing these issues and citing evidence to fill the void in the record. After considering that brief and Defendants' response, the court will determine if Ms. Carter-Miller's hostile environment claims can proceed to a jury.

**D.    Ms. Carter Miller's Retaliation Claims Fail.**

Retaliation claims invoking § 1981 or the WLAD, like disparate treatment claims, are subject to the *McDonnell Douglas* burden-shifting framework. *Hudon v. W. Valley Sch. Dist. No. 208*, 97 P.3d 39, 46 (Wash. Ct. App. 2004); *Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1105, 1108 (9th Cir. 2008). In this case, however, the court need not proceed beyond the first part of that framework, as Ms. Carter-Miller has insufficient evidence to make out a prima facie case of retaliation.

To make out a prima facie case, a plaintiff claiming retaliation must provide evidence that "(1) [she] engaged in a protected activity; (2) [her] employer subjected [her] to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action." *Ray*, 217 F.3d at 1240; *see also Surrell*, 518 F.3d at 1108. In this case, the protected activity that Ms. Carter-Miller relies upon is her

---

[10] Ms. Carter-Miller's evidence that BCC administrators did not respond adequately to incidents occurring elsewhere on campus is irrelevant. Ms. Carter-Miller must present evidence that a supervisor was aware of *her* hostile working conditions and failed to remedy them.

complaints to Dr. Bennett, Ms. Felton, and Dr. McKinnon regarding her perception that others at BCC were discriminating against her. There is no question that such complaints are protected activities. *See, e.g.*, *Ray*, 217 F.3d at 1240 & n.3.

Ms. Carter-Miller's prima facie case fails because she has no evidence of a causal link between her discrimination complaints and any adverse employment action. The court has already noted its concerns about the alleged adverse employment actions against Ms. Carter-Miller. But even assuming, *arguendo*, that *all* conduct about which she complains is an adverse employment action, she has not connected any of that conduct to her discrimination complaints. The evidence shows that the only persons to whom she complained about race discrimination were Dr. Bennett, Dr. McKinnon, and Ms. Felton. Carter-Miller Decl. ¶¶ 38, 43, 47, 107; Felton Decl. ¶ 6. She does not allege that any of these three people took any adverse employment action against her. More importantly, she does not allege that any of these people communicated her discrimination complaints to anyone who took an alleged adverse employment action against her. Although both Ms. Felton and Dr. McKinnon submitted declarations on Ms. Carter-Miller's behalf, neither of them state that they ever communicated Ms. Carter-Miller's discrimination complaints to anyone who took an adverse action against her, except Dean Leatherbarrow. Dean Leatherbarrow, however, did not know he was taking action against Ms. Carter-Miller when he canceled her classes, eliminating any inference that he had a retaliatory motive for his decision. There is no evidence in the record that Ms. Karnes, Ms. Tedeschi, Ms. Weber, or anyone else who conceivably took an adverse employment action against Ms. Carter-Miller was aware that she had made discrimination complaints. No reasonable jury, therefore, could infer that they took adverse actions because of those discrimination complaints.

**E.      The Court Declines to Address Defendants' Motion to Strike.**

Defendants used their reply brief to move to strike all or part of numerous declarations that Ms. Carter-Miller submitted because they are irrelevant, or hearsay, or

ORDER – 26

made without personal knowledge. Many of Defendants' objections are valid, but the court's disposition of this action does not require it to strike any evidence. The court therefore does not resolve the motion to strike.

## IV. CONCLUSION

For the reasons stated above, the court GRANTS in part Defendants' motion for summary judgment (Dkt. # 109). The court dismisses Ms. Carter-Miller's Title VI claims, her claims for disparate treatment discrimination, and her claims for retaliation. The court reserves ruling on Ms. Carter-Miller's hostile environment claims pending receipt of a supplemental brief of no more than 10 pages as described in Part III.C.2, *supra*, no later than October 20, 2008. Defendants may submit an opposition brief subject to the same page limit no later than October 27, 2008. The court will not consider a reply brief. If Ms. Carter-Miller chooses to challenge the court's finding that Dean Leatherbarrow was not aware that she was the instructor whose classes he cancelled in May 2007, she may do so in a motion for reconsideration to be filed no later than October 20, 2008. Pending consideration of these briefs, the court VACATES the trial date and all pending pretrial deadlines. The court sets December 1 as the new trial date. In the event that court finds triable claims after considering the parties' supplemental briefs, the court will impose new deadlines for motions in limine, jury instructions, and other pretrial submissions in conjunction with its order addressing the supplemental briefing.

DATED this 8th day of October, 2008.


The Honorable Richard A. Jones
United States District Judge

ORDER – 27